# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 95-1554

_____

United States of America,             *
                                       *
    Plaintiff - Appellee,          *
                                       *
    v.                             *
                                       *
Desmond Rouse,                         *
                                       *
    Defendant - Appellant.         *

_____

No. 95-1556

_____

United States of America,             *
                                       *
    Plaintiff - Appellee,          *
                                       *   Appeal from the United States
    v.                             *   District Court for the
                                       *   District of South Dakota
Jesse Rouse,                           *
                                       *
    Defendant - Appellant.         *

_____

No. 95-1558

_____

United States of America,             *
                                       *
    Plaintiff - Appellee,          *
                                       *
    v.                             *
                                       *
Garfield Feather,                      *
                                       *
    Defendant - Appellant.         *

_____

No. 95-1559
_____

United States of America,          *
                                   *
     Plaintiff - Appellee,         *
                                   *
     v.                            *
                                   *
Russell Hubbeling,                 *
                                   *
     Defendant - Appellant.        *
                          _____

                    Submitted:   March 3, 1997

                       Filed:    April 11, 1997
                          _____

Before McMILLIAN, BRIGHT, and LOKEN, Circuit Judges.
                          _____


LOKEN, Circuit Judge.


     Brothers Desmond and Jesse Rouse, and their cousins, Garfield
Feather and Russell Hubbeling, appeal convictions for sexual abuse
of young children on the Yankton Sioux Indian Reservation, raising
numerous issues.  A divided panel reversed and remanded for a new
trial on grounds that the district court erred in excluding certain
expert opinion testimony and in denying defendants' motion for
independent pretrial psychological examinations of the abused
children.  See United States v. Rouse, 100 F.3d 560 (8th Cir.
1996).  After the court granted the government's suggestion for
rehearing en banc and vacated the panel opinions, the panel granted
the government's petition for rehearing, and the court denied
rehearing en banc as moot.  Having further considered the parties'
contentions on appeal, we now affirm.

# I.  Background.

The victims are granddaughters of Rosemary Rouse.  During the summer and fall of 1993, defendants lived at Rosemary's home on the Yankton Sioux Reservation.  The victims also lived or spent a great deal of time at this home.  In October 1993, five-year-old R. R. was placed with Donna Jordan, an experienced foster parent, due to neglect and malnutrition.  R. R. disclosed apparent sexual abuse to Jordan, who reported to the Tribe's Department of Social Services ("DSS") (as Jordan was required to do) that R. R. said she had been sexually abused.  On January 10, 1994, DSS told Jordan to take R. R. to therapist Ellen Kelson.  After an initial interview, Kelson reported to DSS (as Kelson was required to do) that R. R. had reported acts of sexual abuse against herself and other children in the Rouse home.  On January 11, DSS removed thirteen children living in the Rouse home and placed them in Jordan's foster home.  Of the four who disclosed sexual abuse by their uncles, T. R. was seven years old, L. R. was six, R. R. was five, and J. R. was four and one-half.  The fifth victim of the alleged offenses, F. R., was a twenty-month-old infant.

Four days later, pediatrician Richard Kaplan examined the children.  Dr. Kaplan reported to DSS his medical findings and what the children had said about sexual abuse.  J. R. told Dr. Kaplan, "Uncle Jess hurt me," pointing to her left labia; Dr. Kaplan found a recent bruise or contusion consistent with that kind of abuse.  L. R. had "a fairly acute injury" on the right side of her labia majora which "really hurt her."  R. R. told Dr. Kaplan, "I have a bruise where my uncle put his private spot," and Dr. Kaplan found a sagging vagina and a scar on her anus.  Dr. Kaplan found that T. R. had "obvious trauma and contusion . . . and very, very much tenderness" on her labia majora; T. R. told him, "Uncle Jess hurt

me there." On January 19 and 21, 1994, FBI Special Agent William Van Roe and BIA Criminal Investigator Daniel Hudspeth interviewed J. R., T. R., R. R., and L. R. The children again reported sexual abuse by their uncles. The children were also seen by a psychiatrist, who referred them to Kelson for therapy. Kelson first saw the children in a group on January 22.

On February 11, Dr. Robert Ferrell conducted a colposcopic examination of the five victims. Dr. Ferrell found "very significant" damage to R. R.'s hymenal ring and tearing in her anal area consistent with anal intercourse. He noted a "whole constellation of findings" indicating L. R. had been abused -- damage to her hymenal area, furrowing on either side of her vagina, chronic irritation or trauma, and "clue cells" that are "known to be sexually transmitted." To Dr. Ferrell, a scar on J. R.'s hymen where a tear had healed was an "important finding," while T. R.'s "hymenal ring was essentially gone," the entire area was irritated, and she had furrows in her vagina. Infant F. R. had "tearing and scarring of the anal mucosa."

Defendants' medical expert, Dr. Fay, admitted that the reported hymenal scarring on L. R., R. R., and J. R. "certainly . . . leads you to think about sexual abuse," and that "a labial injury . . . is a very significant finding" of abuse. In its rebuttal, the government called Dr. Randall Alexander, a member of the Board of Governors of the National Committee to Prevent Child Abuse. Dr. Alexander testified that it takes considerable force to inflict labial injuries like those exhibited by three of the victims. "It's rare to see one [in young girls] and to see three of them show up is just . . . rareness to the third power."

-4-

On March 24, 1994, a grand jury indicted Feather, Hubbeling, Duane Rouse, Desmond Rouse, and Jesse Rouse on twenty-three counts of aggravated sexual abuse in violation of 18 U.S.C. § 2241(c). After a three week trial, the jury acquitted Duane Rouse. It convicted Desmond Rouse on three counts, Jesse Rouse on two counts, Feather on four counts, and Hubbeling on two counts. They received long prison sentences but raise no sentencing issues on appeal. We consolidated their four appeals.

## II. Issues Concerning the Victims' Trial Testimony.

The government's case consisted primarily of testimony by the two physicians, the four oldest victims, another child who witnessed acts of sexual abuse, and FBI Agent Van Roe. On appeal, defendants raise numerous issues regarding the district court's[1] handling of the critical child victim testimony.

### A. Denial of Defense Access to the Children.

Prior to trial, the victims lived with foster parents in the legal custody of DSS. Defendants argue they were denied their Sixth Amendment right to effective cross-examination and their Fifth Amendment right to due process because DSS refused to permit defense counsel interviews of the victims before trial. Defendants also argue that the district court erred in refusing to order additional medical examinations of the victims prior to or during the trial, and lengthy pretrial psychological interviews by a defense expert.

---

[1]The HONORABLE LAWRENCE L. PIERSOL, United States District Judge for the District of South Dakota.

1.   When a child witness is in the legal custody of a social services agency, that agency as custodian may refuse requests for pretrial interviews.  See Thornton v. State, 449 S.E.2d 98, 109-10 (Ga. 1994); Hewlett v. State, 520 So. 2d 200, 203-04, (Ala. Crim. App. 1987); see also O'Leary v. Lowe, 769 P.2d 188, 192-93 (Or. 1989) (en banc).  In this case, defense counsel never complained to the district court that DSS denied them pretrial access to the child witnesses, so this issue was not preserved for appeal.[2]  Defendants admit that DSS made the decision to deny access; they do not point to evidence that the prosecution interfered.  Cf. United States v. Murdock, 826 F.2d 771-773-74 (8th Cir. 1987).  In these circumstances, there was no error, much less plain error.

2.   Defendants did file motions to compel additional medical examinations and psychological interviews.  The evidence at a pretrial evidentiary hearing revealed that the victims received two medical examinations.  Dr. Kaplan found physical evidence consistent with sexual abuse but did not perform thorough examinations.  Instead, he referred the children to Dr. Ferrell, an obstetrician/gynecologist, who examined the anesthetized children using a colposcope instrument for magnified viewing of the genital area.  Dr. Ferrell reported tearing and scarring of infant F. R.'s anal mucosa, and evidence of significant trauma to the other victims' hymenal areas.  He testified that this evidence as a whole indicated abuse.

Defendants argued that another examination was necessary because Dr. Kaplan's examinations were not sufficiently thorough and Dr. Ferrell was not experienced in pediatric sexual abuse

---

[2]Because one defense theme at trial was that DSS contaminated the victims as witnesses by isolating them in the months before trial, defendants' failure to raise this access issue with the district court was no doubt by design.

examinations. The victims' guardian ad litem opposed additional medical examinations. The district court denied the motion for further examinations because the detailed reports of Drs. Kaplan and Ferrell were available to defendants, and no good cause had been shown "that it is necessary to the adequate defense of these cases for the alleged victims to again, for a third time, undergo these invasive procedures at the hands of strangers."

Regarding the request for psychological interviews, the hearing evidence revealed that social worker Kelson had counseled the victims but took no part in investigating the alleged abuse. Her focus was therapy, and her detailed reports were available to the defense. Defendants argued that their expert, psychologist Ralph C. Underwager, needed to interview the victims to demonstrate that suggestive interviewing and environmental pressures made the children's testimony unreliable. The government advised that it would request interviews by its expert if defense interviews were allowed. The victims' guardian ad litem opposed psychological examinations, particularly by adversarial experts. The district court denied defendants' motion for interviews by Underwager because there "has not been good cause shown as to why this additional intrusion into the alleged victims already troubled lives should be ordered."

We agree with the district court that defendants' showing of need for these examinations was insufficient. Drs. Kaplan and Ferrell were well qualified. Dr. Ferrell had ample experience conducting colposcopic examinations, had examined children in his practice, and had received training on sexual abuse during his residency. Dr. Kaplan examines six to seven hundred children each month for sexual abuse. He participated in Dr. Ferrell's examinations, and concurred in his findings. Their detailed

reports and findings were made available to defendants' medical expert. And defendants extensively cross-examined Drs. Kaplan and Ferrell at trial.

Likewise, defendants did not establish need for the requested psychological interviews. Defense counsel and Dr. Underwager had access to Agent Van Roe's interview reports and therapist Kelson's extensive notes of her sessions with the children. Kelson was called as a defense witness at trial and questioned about her counseling methods and contacts with the victims. Dr. Underwager stated at the motion hearing that he had sufficient information to assess whether the children had been sexually abused.[3] He observed the trial testimony of the victims and therapist Kelson, assisted defense counsel at trial, testified regarding the effects of child interview techniques, and was prepared to express opinions on the suggestibility of the investigative and therapeutic practices employed. See Spotted War Bonnett, 882 F.2d at 1362 (interview properly denied because defense expert reviewed other interview records and was present when victim testified).

Finally, the district court property gave strong consideration to the victims' interests. An adult witness may simply refuse to undergo adversarial medical or psychological examinations. See United States v. Bittner, 728 F.2d 1038, 1041 (8th Cir. 1984) ("the defendant's right of access is not violated when a witness chooses

---

[3]Defendants did not tell the district court that psychological examinations were needed to determine the victims' competency to testify. On appeal, defendants argue that proper hearings were not held to assess competency, but they filed no written motion in the district court for competency examinations and thus failed to preserve this issue. See 18 U.S.C. § 3509(c)(2-4); United States v. Spotted War Bonnett, 882 F.2d 1360, 1362-63 (8th Cir. 1989) (subsequent history omitted). Children are presumed competent to testify, and the district court made specific findings that each child witness was competent.

of her own volition not to be interviewed"). With child witnesses who are in protective custody, the issue is more complex because they are not able to make these difficult decisions for themselves. Of course, the court must protect a criminal defendant's right to a fair trial, but it must also protect the State's paramount interest in the welfare of the child. Making court-ordered adversarial examinations routinely available would raise a barrier to the prosecution of this kind of crime by maximizing the trauma that its victims must endure. At a minimum, therefore, the court should heed a custodial agency's opinion that pretrial access to the child for investigative or adversarial purposes is unnecessary or unwise.[4]

Given the difficulty of balancing these important interests, we conclude that, if the custodian of a child witness opposes access as not in the child's best interest, defendant must show that denial of access would likely result in an absence of "fundamental fairness essential to the very concept of justice" before the trial court need reach the question whether some type of access may appropriately be ordered.[5] Here, the victims' guardian opposed access, and defendants did not show need for the requested examinations. The district court did not abuse its discretion in

---

[4]Unlike the court in United States v. Benn, 476 F.2d 1127, 1130-31 (D.C. Cir. 1973), we do not assume that the court presiding over a criminal case may *compel* pretrial testing of a child that a social services arm of government believes to be adverse to the child's best interests. To posit an extreme example, if a government custodian should opine that the interests of a child witness require dismissing a prosecution rather than compelling the child to undergo further traumatic testing, and if the court can devise no other way to protect the defendant's right to a fair trial, the criminal case may have to be dismissed.

[5]This is the basic test for a denial of due process. See United States v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982).

declining to order DSS to subject the victims to further medical or psychological examinations.

### B.  Victim Testimony by Closed Circuit Television.

Prior to trial, the government filed a motion to permit all child witnesses to testify by closed circuit television.  At a hearing on this motion, therapist Kelson testified that the victims were afraid of defendants -- "They still believe if they walked in the courtroom today that their uncles would attack them."  The district court denied the motion without prejudice, concluding there had not been a sufficient showing that the children could not testify due to fear of the defendants.

At trial, when three of the victims were called as witnesses and appeared to be emotionally unable to testify in open court, the district court questioned each child in chambers, in the presence of defense counsel, one prosecutor, the child's guardian ad litem, and a court reporter.  See 18 U.S.C. § 3509(b)(1)(c).  Five-year-old J. R. was unable to speak when called to testify and stated in chambers that she was afraid to speak in front of her uncles. Considering this statement along with Kelson's pretrial testimony, the court found that defendants' presence in the courtroom would "more than anything else prevent her from testifying."  The court made similar findings after questioning six-year-old R. R., who was found sobbing outside the courtroom and affirmed in chambers that she was crying out of fear of her uncles; and nine-year-old T. R., who became so fearful before testifying that "the guardian ad litem would have had to physically pull her into the courtroom." Defendants argue that the district court erred in permitting these three victims to testify by closed circuit television.  (The other two child witnesses were able to testify in open court.)

The Sixth Amendment's Confrontation Clause "guarantees the defendant a face-to-face meeting with the witnesses appearing before the trier of fact." Coy v. Iowa, 487 U.S. 1012, 1016 (1988). However, this right is not absolute and must accommodate the State's "compelling" interest in "the protection of minor victims of sex crimes from further trauma and embarrassment." Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607 (1982). Accordingly, "where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure" which preserves "the essence of effective confrontation" -- testimony by a competent witness, under oath, subject to contemporaneous cross-examination, and observable by the judge, jury, and defendant. Maryland v. Craig, 497 U.S. 836, 851, 857 (1990). Testimony by closed circuit television is a procedure now authorized by statute. See 18 U.S.C. § 3509(b).

Before invoking such a procedure, the district court must find that the child "would be traumatized, not by the courtroom generally, but by the presence of the defendant." Hoversten v. Iowa, 998 F.2d 614, 616 (8th Cir. 1993), quoting Craig, 497 U.S. at 856. See 18 U.S.C. § 3509(b)(1)(B)(I) (child may testify by closed circuit television "if the court finds that the child is unable to testify in open court in the presence of the defendant . . . because of fear"). In this case, the district court made specific "because of fear" findings for three victims. Our review of the children's responses to the court's questions in chambers and the prior testimony by therapist Kelson persuades us these findings are not clearly erroneous. See United States v. Carrier, 9 F.3d 867, 870-71 (10th Cir. 1993), cert. denied, 114 S. Ct. 1571 (1994).

-11-

Defendants argue that the district court's findings are inadequate because they were not based upon the expert testimony required by § 3509(b)(1)(B)(ii). However, the statute does not require an expert to support a "because of fear" finding. That finding may be based upon the court's own observation and questioning of a severely frightened child. "[O]nce the trial has begun, the court may judge with its own eyes whether the child is suffering the trauma required to grant the requested order." H.R. Rep. No. 101-681(I), 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6574. We also reject defendants' contention that the closed circuit television system infringed their Sixth Amendment rights because defense counsel could not see the jury while cross examining the sequestered witnesses.[6] Compare Spigarolo v. Meachum, 934 F.2d 19, 24 (2nd Cir. 1991).

### C. Evidence of Victims' Past Sexual Conduct.

The day before trial, the government filed a motion to preclude evidence of the victims' past sexual activity because defendants had not filed written motions "at last 14 days before trial," as required by Fed. R. Evid. 412(c)(1). Defendants then filed three untimely motions to offer evidence that one victim had engaged in sexual activity with another child living in her neighborhood, that another victim had made accusations of inter-household sexual activity,[7] and that a third victim had acted-out

---

[6]The system included five monitors in the courtroom for the judge, jury, defense expert, and defendants to view the child testifying in chambers; a monitor for the child witness to view defendants as she testified; and separate communication lines permitting each defendant to confer with his attorney.

[7]Evidence that the victim has accused others of sexual abuse is subject to Rule 412's limitations. United States v. Provost, 875 F.2d 172, 177-78 (8th Cir.), cert. denied, 493 U.S. 859 (1989).

in a sexual manner. The district court excluded this evidence because the allegations flowed from an interview with a young boy almost three months before trial and therefore defendants had no good cause for their untimely motions. See Rule 412(c)(1)(A).

On appeal, defendants argue that the district court abused its discretion because they effectively gave Rule 412 notice by mentioning the victims' sexual activity in their pre-trial motion for independent medical examinations. We disagree. Rule 412 limits the admissibility of such evidence to protect the victims of rape and sexual abuse. See Provost, 875 F.2d at 177; United States v. Azure, 845 F.2d 1503, 1506 (8th Cir. 1988). The Rule has strict procedural requirements, including a timely offer of proof delineating what evidence will be offered and for what purpose, and an *in camera* hearing at which the victim may respond. Defendants' vague notice fell far short of complying with the Rule, and the district court properly excluded this evidence. See United States v. Eagle Thunder, 893 F.2d 950, 954 (8th Cir. 1990).

## D.  Admission of Child Hearsay.

At trial, the government offered testimony by FBI Agent Van Roe of what four victims said during Van Roe's initial interviews in January 1994. Defendants objected. After questioning Agent Van Roe outside the jury's presence, the court admitted statements made by the three oldest victims under the residual hearsay exception, Fed. R. Evid. 803(24). On appeal, defendants argue that the district court abused its discretion in admitting this testimony.

This contention is at odds with "a formidable line of Circuit precedent that sanctions the use of hearsay testimony in child sexual abuse cases." United States v. St. John, 851 F.2d 1096,

1093 (8th Cir. 1988).  Here, the district court determined that FBI Agent Van Roe had been trained to interview children in abuse cases, interviewed the children individually at the home of their foster parent, and did not ask leading questions.  Agent Van Roe's testimony and interview notes established that the victims' responses were spontaneous and not repetitious.  The victims' statements also provided more details regarding the abuse than their testimony at trial.  In these circumstances, the district court did not abuse its discretion in admitting the initial interview statements.  See United States v. Grooms, 978 F.2d 425, 426-28 (8th Cir. 1992).  Defendants also argue that admission of the victims' statements violated the Confrontation Clause as construed in Idaho v. Wright, 497 U.S. 805, 815-16 (1990).  However, the Confrontation Clause was satisfied because the victims testified at trial.  See Spotted War Bonnet, 933 F.2d at 1473.

## III.  Exclusion of Expert Testimony on Implanted Memory.

After failing to exclude or nullify the testimony of the child victims, the defense concentrated on undermining the credibility of that testimony.  In addition to cross-examining the doctors, the victims, and FBI Agent Van Roe during the government's case, the defense called therapist Kelson and DSS witnesses as adverse witnesses, seeking to prove that the children were forcibly removed from Rosemary Rouse's home and then interviewed at length by many

government investigators.[8]  The culmination of this defense was the testimony of psychologist Underwager as a defense expert witness.

The district court held a preliminary hearing to explore whether Dr. Underwager's proposed testimony was sufficiently reliable scientific evidence that would assist the jury to understand a fact in issue.  See Fed. R. Evid. 702; Daubert v. Merrill Dow Pharmaceuticals, Inc., 113 S. Ct. 2786, 2796 (1993).  The court heard Dr. Underwager's proposed testimony concerning his theories of "learned" or "implanted" memory.  After reviewing scientific research and publications offered in support of these theories, the court made two preliminary rulings:

> I'm not going to allow Dr. Underwager to testify as to whether or not the [child] witness's testimony is believable or not, or telling the truth or not.
>
> [W]ith regard to the principles and the methodology, this is an area of valid scientific inquiry, but there is not anywhere near yet the agreement in the community as to methods, techniques, testings or reliability that would warrant the admissibility before a jury of these matters . . . .  It would result in a confusion of the issues, a possible misleading of the jury by undue reliance possibly being placed upon [one side's methodology].  So, for these reasons, under Daubert, I'm not going to allow evidence with regard to the different . . . psychological methods of evaluating the reliability of witnesses.

---

[8]Without citing specific instances of error or supporting authority, defendants argue that the district court erred by failing to control witness Kelson.  We have reviewed this portion of the trial testimony and conclude that the court properly exercised its discretion in maintaining reasonable control over the examination and testimony of this witness.  See Fed. R. Evid. 611(a); United States v. DeLuna, 763 F.2d 897, 911 (8th Cir.), cert. denied, 474 U.S. 980 (1985).

Later in the trial, Dr. Underwager was called as a defense witness. He testified at length concerning his own research into the ways in which the reliability of children's allegations of physical or sexual abuse may be tainted by adult questioning practices that suggest false answers or even implant false memories. Dr. Underwager identified for the jury practices of "suggestibility" that produce unreliable child testimony -- use of leading or coercive questions; communicating adult assumptions that cause the child to give what is perceived as the desired answer;[9] repetitive questioning; play therapy, which Dr. Underwager opined has "no scientific support"; adult use of rewards or negative reinforcement that motivate children to lie; and "cross germination" among a group of children who pick up stories from each other. Dr. Underwager opined that "a memory can be created . . . by questioning someone." Moreover, "[t]he younger the child, the greater the suggestibility, the more vulnerable they are to the influences."

When the prosecution successfully objected to some questions put to Dr. Underwager, defendants made an offer of proof at the end of his direct examination. In a three-page narrative answer to the question whether "there's been a practice of suggestibility employed" with the child victims, Dr. Underwager opined (i) that therapist Kelson had exerted "massive social influence" on the victims; (ii) that Kelson engaged in "highly suggestive and highly contaminating" practices; (iii) that the prosecutor used leading questions at trial and the children "were comfortable doing the yes/no bit," showing "they'd learned" to answer yes; (iv) that Van Roe's use of diagrams was "very suggestive and very leading"; (v)

---

[9]Dr. Underwager testified that "preconceived assumptions of the interviewer are the single most powerful determinant of what comes out of an interview."

that the children "were kidnapped . . . taken from their families, taken to this strange place where all of the people are concerned that they talk about sex abuse"; and (vi) that the "total environment [was] one of the most powerful and coercive influences upon children that I've seen." The district court excluded these opinions as not proper subjects of expert opinion.

On appeal, defendants argue generally that the district court misapplied Daubert in excluding Dr. Underwager's testimony. We find two distinct components to this issue. First, we conclude that the district court's preliminary pretrial rulings regarding the scope of Dr. Underwager's testimony did not abuse its discretion. See Cook v. American S.S. Co., 53 F.3d 733, 738 (6th Cir. 1995) (standard of review). It is clear from the record that this expert was intent upon expressing his ultimate opinion that the victims' accusations of sexual abuse were not credible.[10] But assessing the reliability or credibility of a victim's accusations is the exclusive function of the jury. Dr. Underwager's opinions about witness credibility were properly excluded. See Westcott v. Crinklaw, 68 F.3d 1073, 1076 (8th Cir. 1995); United States v. Witted, 11 F.3d 782, 785-86 (8th Cir. 1993); United States v. Azure, 801 F.2d 336, 339-40 (8th Cir. 1986).[11] The district court was also well within its discretion in ruling that Dr. Underwager

_____

[10]In a letter to defense counsel just before trial that became a preliminary hearing exhibit, Dr. Underwager said he was prepared to opine "that the children in this case have been subjected to massive and coercive social influence by adults . . . such as to make it highly likely any statements are so contaminated by adult behaviors as to be unreliable."

[11]In this regard, we note that Dr. Underwager's attempts to express such opinions in other child abuse cases have been consistently rejected. See State v. Swan, 790 P.2d 610, 632 (Wash. 1990) (en banc), cert. denied, 498 U.S. 1046 (1991); State v. Erickson, 454 N.W.2d 624, 627-29 (Minn. App. 1990).

should not embellish his own research and opinions by telling the jury about the research and writings of other psychologists because these works have not produced a consistent body of scientific knowledge and therefore admission of other theories and writings would result in a battle of experts that could confuse or even mislead the jury.

The second issue, whether the court erred in rejecting defendants' offer of proof at trial, is more difficult. Indeed, it is an issue on which we continue to disagree. A qualified expert may explain to the jury the dangers of implanted memory and suggestive practices when interviewing or questioning child witnesses, but may not opine as to a child witness's credibility. That leaves a troublesome line for the trial judge to draw -- as the expert applies his or her general opinions and experiences to the case at hand, at what point does this more specific opinion testimony become an undisguised, impermissible comment on a child victim's veracity? The issue was unusually difficult for the district court in this case because defendants made their offer of proof through Dr. Underwager's three-page monologue, instead of asking the court to rule on specific questions and answers, and because of Dr. Underwager's obvious desire to testify impermissibly on the children's lack of credibility.

Our differing views on the question whether the district court erred in rejecting defendants' offer of proof are set forth in the vacated panel opinions. See Rouse, 100 F.3d at 566-74, 582-85. Having again considered this issue in light of the voluminous trial record, a majority of the panel has concluded that exclusion of this additional expert testimony was, in any event, harmless error. We base this conclusion on a number of factors. First, the jury heard evidence as to the interviewing techniques used by foster

parent Jordan, therapist Kelson, and FBI Agent Van Roe. It learned of the social influences affecting the victims at the time they accused their uncles of sexual abuse. And it observed the victims testify and knew that the prosecutor asked the children leading questions at trial.[12] Second, the jury heard Dr. Underwager describe at length the ways in which adults can influence children's memories and the possible impact of such influences on their credibility. Defense counsel used this expert testimony to define their theory of implanted memory in closing argument:

> The questions were asked over and over and over again and, when the story came out the way the adults wanted it, then the children were rewarded . . . . [W]hen [J. R.] was testifying . . . did you notice [the prosecutor] . . . phrased most of the questions in a manner in which she would get a positive response, a "Yes" answer. . . . [Dr. Underwager] talked about the influence that people have on children, when they interview kids. He talked about memory, the process of reconstruction, implantation of memory, play-therapy, worthless. . . . The children only felt comfortable answering "Yes" or "No". They didn't show memory of the events. The FBI Agent's diagram that he used, the drawing of the male body with the penis drawn in, what did that tell the kids that he wanted to talk about? Everything was calculated to produce some sort of compliance with these kids . . . .

This gave the jury an informed basis on which to make its ultimate determinations as to the victims' credibility. Third, the victims' trial testimony was consistent with their "free recall" -- R. R.'s reports of abuse to Jordan and Kelson in early January, and the four oldest victims' reports to Dr. Kaplan during his initial medical examinations. These unprogrammed disclosures preceded the

---

[12]When the first child witness (the nine-year-old male cousin) froze on the stand in open court, the district court, consistent with numerous Eighth Circuit cases, ruled that leading questions could be asked of reticent child witnesses. *Defendants did not object to this ruling nor raise the issue on appeal.*

FBI interviews and Ellen Kelson's therapy.  Dr. Underwager testified for the defense that, "[b]asically, the most reliable information is obtained from free recall."  In these circumstances, we conclude that exclusion of additional testimony by Dr. Underwager regarding whether a "practice of suggestibility" was employed on the victims "could not have had substantial influence on the outcome of the case," Azure, 845 F.2d at 1507, the governing harmless error standard.  See 28 U.S.C. § 2111; Brecht v. Abrahamson, 113 S. Ct. 1710, 1718 & n.7 (1993).

## IV.  Juror Bias.

After the trial, Verna Severson, who worked with juror Patricia Pickard at a local preschool, called the Clerk's Office to complain that Pickard should not have served on the jury because she is prejudiced against Native Americans.  The court held an evidentiary hearing on this issue.  Severson testified that Pickard made derogatory statements about Native Americans before the trial; Pickard denied this allegation.  Severson alleged that Pickard refused to teach a Native American unit in her class; Pickard and the school's director testified that Pickard had taught a Native American unit for years.  Severson testified that Pickard had stated, "it's a sad thing to be born an Indian girl because Indian girls are used for sexual purposes"; Pickard explained that her sister-in-law, a counselor, made that comment after the trial and Pickard had repeated it not as her own belief.  Three of Pickard's other co-workers testified that Pickard is not a racist.  Two witnesses questioned Severson's reputation for truthfulness.

After hearing this testimony, the district court denied defendants' motion for a new trial, finding that juror Pickard had "responded honestly and accurately" during *voir dire* and had not

concealed "any racially prejudiced attitudes, beliefs, or opinions" about Native Americans. The court found that "as between juror Pickard and Ms. Severson, juror Pickard [was] the more credible witness." The court further found that the jury foreman and an alternate juror "testified credibly that they did not hear juror Pickard make racially disparaging remarks about the defendants or about Native American people during the trial," and "that no improper outside influence affected the jury." These findings are not clearly erroneous. They establish that defendants are not entitled to a new trial because of juror Pickard's responses during *voir dire*. See McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984); United States v. Whiting, 538 F.2d 220, 222-23 (8th Cir. 1976).

Defendants further argue that they are entitled to a new trial because juror Pickard admitted that she laughed at a comment about Native Americans during the jury deliberations. However, we agree with the district court that this neither overcame the court's finding that the jury was not subjected to improper outside influence, nor justified further inquiry into the validity of the verdict. See Fed. R. Evid. 606(b); United States v. Tanner, 483 U.S. 107, 120-27 (1987).

## V. Jurisdiction Issues.

After both sides rested, defendants moved for judgments of acquittal on the ground that the government had failed to prove the alleged offenses occurred in Indian Country. The government responded by moving to reopen its case to better establish that the alleged sexual abuse occurred at grandmother Rosemary's home on the Yankton Sioux Reservation. After expressly considering both the possible prejudice to defendants in reopening, and the impact on

the child victims of having to testify again, the district court ruled that the government could reopen to offer limited evidence regarding offense location. The parties then stipulated that this evidence would establish that all alleged offenses except those involving J. R. had occurred in Indian Country. The government reopened its case and placed this stipulation into evidence, and the court denied defendants' motions for judgment of acquittal.

## A. Allowing the Government To Reopen Its Case.

Defendants first argue that the district court abused its discretion by permitting the government to reopen its case to establish this jurisdictional fact. The trial court has broad discretion to allow the prosecution to reopen to establish an element of an offense after the defendant has moved for judgment of acquittal. See, e.g., United States v. Powers, 572 F.2d 146, 152-53 (8th Cir. 1978), involving whether the weapon at issue was a "firearm." The relevant inquiry is "whether the evidence caused surprise to the defendant, whether he was given adequate opportunity to meet the proof, and whether the evidence was more detrimental to him because of the order in which it was introduced." United States v. Webb, 533 F.2d 391, 395 (8th Cir. 1976). Here, defendants were not surprised by the evidence, and the district court carefully limited its ruling to avoid prejudice from allowing victim testimony late in the trial. There was no abuse of discretion.

## B. Insufficient Evidence of Jurisdiction.

Defendant Jesse Rouse also argues that there was insufficient evidence that he sexually abused J. R. in Indian Country, a fact essential to federal jurisdiction over that offense. See 18 U.S.C.

§ 1153(a).  The trial testimony focused on events that occurred at "grandma's house," grandmother Rosemary Rouse's home in Indian Country.  J. R. testified that she lived in Marty, that she spent a lot of time at grandma's house, and that her uncles were often in that house.  She testified that it was not safe at the house "[b]ecause our uncles are doing naughty stuff to us."  Jesse testified that he lived at Rosemary's house from September 1993 until the victims were removed in January 1994.  Viewing this evidence in the light most favorable to the jury's verdict, as we must, we agree with the district court that there was sufficient evidence to support the jury's finding of jurisdiction.

The judgments of the district court are affirmed.

McMILLIAN, Circuit Judge, concurring in the result.

I concur in the result affirming the convictions, but only because I agree that the exclusion of the expert evidence was harmless error.

BRIGHT, Circuit Judge, dissenting.

I respectfully dissent.  Previously, two judges on this panel reversed the convictions in this case because the trial judge erred by rejecting the expert opinion evidence in question.  United States v. Rouse, et al., 100 F.3d 560 (8th Cir. 1996).  The new majority now affirms the convictions on grounds that such error was harmless.  I disagree.  Depriving the jury of the questioned evidence critically eroded the strength of the defense and, therefore, did not constitute harmless error.[13]

---

[13]In the previous opinion, we also ruled that the trial court prejudicially erred by denying "the defendants' motion for independent psychological examination" of the children in light

## I.  DISCUSSION

This dissent fully incorporates the panel opinion previously reported at 100 F.3d 560.  In the interests of comprehension, however, I shall reiterate some of that prior opinion.

The convictions rested upon the following evidence:  the uncorroborated testimony of four of the thirteen children initially removed from their families, medical evidence describing tissue injuries in the victims' vaginal and anal areas, and statements the alleged victims made to other adults.  In my view, this evidence is suspect.  For example, the "children's evidence and testimony [in this trial] became tainted by suggestive influences to which the children were subject in the investigation and trial, which influences included taking the children (the alleged victims and nine other children) from their families and from their residences" for extended periods of time.  Id. at 562.  During this isolation, which lasted up to six months, social workers and investigators subjected the alleged victims to repeated and intense questioning.  Despite the interrogation, nine of the children steadfastly denied any abuse.

Furthermore, the medical evidence introduced at trial was inconclusive.  For example, the defense challenged the conclusions of the prosecution's witnesses, the prosecution failed to establish the source of any injuries to the alleged victims, and the medical

_____

of the coercive questioning and interrogation of the alleged victims.  See Rouse, 100 F.3d at 562-63.  I stand by this ruling. Nevertheless, this error fails to justify a new trial unless the exclusion of the expert testimony regarding coercive influences on the children constituted prejudicial error.

evidence lacked photographic documentation of the injuries.  <u>See</u> <u>id.</u> at 575-76.  In addition, the district court excluded important evidence of inter-child sexual activity which potentially skewed the medical findings relating to the victims' injuries.  <u>Id.</u>  These ambiguities magnified the importance of the children's testimony to the jury's verdict, thereby exacerbating the harm suffered by the defense when the district court excluded the expert's opinion.  The following discussion reiterates the background for the expert's testimony and explains why the exclusion of that testimony resulted in substantial harm.

## A.   BACKGROUND FOR THE EXPERT TESTIMONY

The panel's earlier opinion discussed the investigation by social services personnel, the FBI's interrogations of the alleged victims and others, and the manner of eliciting the children's testimony.  <u>See</u> <u>id.</u> at 563-66.  The opinion also questioned the reliability of the children's bizarre stories.  <u>Id.</u> at 563-66 (noting, for example, that investigators and social workers offered rewards for the children's "truthful" testimony).

We examine the defense's offer of proof, including background evidence provided to the court by the expert witness outside the presence of the jury.  We repeat from our earlier opinion:

> At trial, the defense offered the testimony of Dr. Ralph Charles Underwager.  Dr. Underwager is a clinical psychologist and has been practicing his profession or teaching psychology for approximately twenty years.  He has conducted extensive research and writing in the area of child sex abuse and is familiar with extensive psychological research into this subject during the past ten years.  His expertise has not been challenged by the prosecutor, only the substance of his testimony.
> . . . .

With this background, we examine Dr. Underwager's foundation and compare that foundation and his commentary on suggestibility with the status as of the time of trial of psychological research and writings concerning child witnesses and their susceptibility to faulty memory. As noted above, in the defense's offer of proof, Dr. Underwager testified outside the presence of the jury that from his review of the files, records and testimony in this matter, there had been "a practice of suggestibility employed in these techniques." (Tr. Vol. IX at 1768.)

He further testified outside the presence of the jury that Kelson's notes revealed she had exerted a massive influence over the children; she had a powerful prior assumption or conclusion that the children had been abused; and she engaged in highly suggestive and contaminating practices, such as the groups and questioning. Dr. Underwager testified the prosecutor asked the children only if they remembered reporting an incident to a particular individual (FBI agent, social worker, etc.), rather than whether they remembered the incident itself; the prosecutor used exclusively leading questions in the courtroom and the children's comfort level showed they were used to this type of questioning. He testified that studies show that adults almost always rely on leading questions given the task of finding something out from a child.

Dr. Underwager found the FBI's use of sexually explicit diagrams very suggestive and leading, and asserted the evidence does not show such diagrams accomplish anything other than to suggest to the child that the interviewer is interested in sexual behavior.

He testified that a large body of research shows that the presence at an interview of several adults--people of relatively high status--increases the conformity and compliance with what those adults expect from a child.

Dr. Underwager testified that the documents from the case files and courtroom testimony suggested to him that powerful and potentially coercive influences had been brought to bear on the small four- and five-year-old children who were taken without notice from their mothers, families and homes, without being told the reasons and kept incommunicado in a strange place where

all the people around them urged them to talk about sex abuse.  (Tr. Vol. IX at pp. 1768-74.)

Id. at 566, 568-69.

The prosecution, however, objected to this offer of proof because the testimony reflected "an area 'within the province of the jury and not within something that an expert should testify on.'"  Id. at 566 (quoting Trial Tr. Vol. IX at 1771).  The district court agreed and "rejected the offer as essentially not the subject of expert testimony and not reliable or relevant under Federal Rule of Evidence 104(a) and confusing and misleading to the jury under Federal Rule of Evidence 403."  Id. at 566-67. Furthermore, the district court "barred the expert witness from testifying on whether or not the investigative practices constituted 'a practice of suggestibility.'"  Id. at 567.

The prior panel opinion demonstrated that the proposed expert testimony passed the test for reliability under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Rouse, 100 F.3d at 567-68, 572 (discussing application of Daubert analysis to "soft science").  That opinion reviewed the nature of the investigations and interrogations of the children against the commentary in a recent article presented to the district court:

> We have examined both the evidence and the literature presented to the district court and conclude that both support the defendants' offer of proof.  In particular, the district court made reference to a recent article by Stephen J. Ceci and Maggie Bruck, Suggestibility of Child Witnesses:  A Historical Review and Synthesis, 113 Psychological Bulletin 403-439 (1993), which reviews the research and writing on the subject and supports the view that the very matters observed and testified to by Dr. Underwager can produce biased, untrue or false memories in children, and more particularly

-27-

young children.  Almost all the other literature presented to the court is consistent with the Ceci-Bruck article.

The Ceci-Bruck article does not state that young children should not testify but observes that many common interviewing practices can produce an altered memory. Among other things, the article documents adequate research indicating the following:

1.  A subject's, particularly a child's, original verbal answers are better remembered than the actual events themselves, yes-no questioning leads to more error, and young children are particularly vulnerable to coaching and leading questions.  Id. at 406-09.

A review of the record here reveals the children were asked entirely leading questions in court.  Even though the children testified by television outside the presence of defendants, the prosecutor asked suggestive questions.  Not only did the questions call only for yes or no answers, the children were asked only if they remembered reporting abuse to law enforcement officers, doctors, and their therapist, rather than whether they remembered the alleged abuse itself.

The questioning at trial represents a highly questionable aspect of testifying about an event.  This is exactly what Dr. Underwager described in his offer of proof.

2.  Children desire to comply or cooperate with the respected authority figure interviewer and will attempt to make answers consistent with what they see as the intent of the questioner rather than consistent with their knowledge of the event even if the question is bizarre.  Id. at 418-19.  Interviewer bias can skew results as a child will often attempt to reflect the interviewer's interpretation of events, particularly when more than one interviewer shares the same presuppositions.  Id. at 422.  If the interviewer's original perception is incorrect, this can lead to high levels of inaccurate recall.

Here, these children were taken from their homes on the basis of a five-year-old's statements, and were placed under the sole supervision and influences of Donna Jordan, Jean Brock, and Ellen Kelson--interviewers who

had decided at the outset that all the children had been sexually abused.

The FBI agents were also strong authority figures--the kind of high status interviewers described by Dr. Underwager--with preconceived notions about the facts of this case, and they did not interview the children until after the children had been with Jordan for over a week. Agent Van Roe testified that he had explained his status as an FBI agent at the initial interview and told the children that an FBI agent was like a policeman on the reservation. Van Roe testified that Jean Brock and foster mother Donna Jordan remained in the room while FBI agents conducted the initial interviews of the children on January 19 and 21, 1994--over a week after the children were taken from their parents' homes, told by Jordan and Brock that this was because their uncles had done bad things to them, and put into the care of Jordan.

At this initial interview, R.R. handed investigator Hudspeth a group of papers which reflected things she had previously told foster mother Donna Jordan which Jordan had written down for her. Thus, agents received a frame of reference which could produce bias, even before the start of the interviews.

3. Repeated questions can produce a change of answers as the child may interpret the question as "I must not have given the correct response the first time," and the child's answers may well become less accurate over time. <u>Id.</u> at 419-20. Repeated questioning of victims often results over time (or even within a single interview) in an inaccurate report.

A three-month hiatus existed from the time R.R. was taken from her home to the time of her complaints of sex abuse. These children were repeatedly questioned by Brock, Jordan, Kelson, doctors and law enforcement agents. By March 1994, the children's accounts of the familial sexual abuse were so skewed that the district court refused to admit these interviews into evidence.

4. Younger children are more susceptible to suggestibility than older children, especially in the context of stereotyping. <u>Id.</u> at 407, 417. Stereotypes organize memory, sometimes distorting what is perceived by adding thematically congruent information that was not perceived, and stereotype formation interacts with

suggestive questioning to a greater extent for younger rather than older children. Id. at 416-17. Studies have shown children are particularly susceptible to an interviewer's "bad man" stereotype, and when repeatedly told the actor is a bad man, they may construct a false account of an event often embellished with perceptual details in keeping with the stereotype. Id.

Here, various persons told the children from the beginning that the defendants were "bad" and that it would not be "safe" to go home until the defendants were gone. The children remained isolated from their families and community.[14] The "bad man-uncle" theme was replayed again and again, including at trial.[15] In addition, the children testified via closed circuit television based on their "fear" of defendants. While closed circuit television, other security procedures at the courthouse, and disallowing the children to see any family members before the trial did not amount to trial error, those procedures served to reinforce the children's "bad men" stereotype of their uncles, the defendants.

---

[14]Kelson testified at a hearing in May 1994 that the children felt isolated and withdrawn and missed the nurture of their mothers and extended families; "[O]ne of the children said they felt trapped, isolated." (Trial Tr. Vol. V at 694.)

[15]Although the children testified that Jordan, their foster mother, told them their uncles had been doing bad things to them and talked to them of the abuse, Jordan testified she had never talked to the children about their uncles or told them that their uncles were bad or did bad things. She subsequently acknowledged she had told the children a lot of bad things had happened to them, had gotten very specific about what these bad things were, and had told them this was not their fault. Jordan testified she deliberately tried to avoid discussing the sex abuse with the children or influencing them, but acknowledged that it had been her experience as a foster parent that children are easily susceptible to suggestion and influence by adults.

Brock also denied ever telling the children that their uncles were bad or explaining to them why they were being taken away. The children's versions and other evidence provided ample foundation for the expert's proposed opinion.

-30-

5. The use of anatomical dolls or sexually explicit materials will not necessarily provide reliable evidence as children may be encouraged to engage in sexual play with dolls, etc., even if the child has not been sexually abused, and further no normative data exists on non-abused children's use of dolls. See id. at 423-25.

The second law enforcement (January 21) interview took place at the United States Attorney's Office with the Assistant United States Attorney present. The children saw an anatomical drawing of a penis. Later, Kelson utilized play therapy and art media, and apparently dream journals. Dr. Underwager testified that exposing children to these materials suggests to them that the authority figure wants information about sex.

6. "[A] major conclusion is that contrary to the claims of some, children sometimes lie when the motivational structure is tilted toward lying." Id. at 433. Patterns of bribes for disclosures, implied threats in nondisclosures, or insinuations that peers have already told investigators of suspects' abusive behavior are highly suggestive. Id. at 423. Children will lie for personal gain, and material and psychological rewards need not be of a large magnitude to be effective. Id.

Here, the children were promised picnics, vacations and even a chance to return home as a reward for their "truthful," successful testimony at trial. They were told they could not go home until their uncles had been successfully removed. Experts are critical of this kind of reward as "bribing" children to "admit" abuse or give abuse-consistent answers, such as promising to end the interview, or giving them other tangible rewards. Such techniques affect the accuracy of children's reports.

7. Dr. Underwager testified regarding the concept of "cross-germination" among the children. Children in studies and in actual cases have shown that peer pressure or interaction with other children has effects on the accuracy of their reporting: they will provide an inaccurate response when other children have "already told" in order to go along with a peer group or be part of the crowd. See id. at 423; see also Stephen J. Ceci, Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony 146-50 (American Psych. Assoc. 1st ed. 1995). In several cases where convictions have been overturned, children were shown to have talked with one

another about the abuse, sometimes even siblings questioned siblings to get them to "open up" or provide incriminating evidence.  Id. at 150-51.

As mentioned above, Kelson reported that she talked to the group in "talk circle"; that the group seemed to have discussed an agenda among themselves each week and that T.R. was the ringleader.  Testimony at trial reflects that Jordan, Kelson, and FBI agents spoke to and questioned the children in groups about the abuse.

The Ceci-Bruck article's summary relating to interviewing of children stated:

> The studies on interviewing provide evidence that suggestibility effects are influenced by the dynamics of the interview itself, the knowledge or beliefs possessed by the interviewer (especially one who is unfamiliar with the child), the emotional tone of the questioning, and the props used. Children attempt to be good conversational partners by complying with what they perceive to be the belief of their questioner. Their perceptions, and thus their suggestibility, may be influenced by subtle aspects of the interview such as the repetition of yes-no questions, but their compliance is evidenced most fully in naturalistic interview situations in which the interviewer is allowed to question the child freely; this gives the child the evidence to make the necessary attributions about the purposes of the interview and about the intents and beliefs of the interviewer.
>
> Observations of interactions in the legal arena highlight the fact that children who testify in court are not interviewed in sterile conditions such as those found in many of the experiments we have reviewed. They are usually questioned repeatedly within and across sessions, sometimes about an ambiguous event by a variety of interviewers, each with their own agenda and beliefs. Children are sometimes interviewed formally and informally for many months preceding an official law-enforcement interview with anatomical dolls,

> providing an opportunity for the child to acquire scripted and stereotypical knowledge about what might have occurred.

Id. at 425.  The authors conclude with these comments:

> Our review of the literature indicates that children can indeed be led to make false or inaccurate reports about very crucial, personally experienced, central events.

. . . .

> Therefore, it is of the utmost importance to examine the conditions prevalent at the time of a child's original report about a criminal event in order to judge the suitability of using that child as a witness in the court. It seems particularly important to know the circumstances under which the initial report of concern was made, how many times the child was questioned, the hypotheses of the interviewers who questioned the child, the kinds of questions the child was asked, and the consistency of the child's report over a period of time.  If the child's disclosure was made in a nonthreatening, nonsuggestible atmosphere, if the disclosure was not made after repeated interviews, if the adults who had access to the child prior to his or her testimony are not motivated to distort the child's recollections through relentless and potent suggestions and outright coaching, and if the child's original report remains highly consistent over a period of time, then the young child would be judged to be capable of providing much that is forensically relevant. The absence of any of these conditions would not in and of itself invalidate a child's testimony, but it ought to raise cautions in the mind of the court.

Id. at 432-33.

-33-

Rouse, 100 F.3d at 569-72.  Other references also supported the reliability of the expert's testimony.[16]

The majority does not dispute that the district court erred by excluding the offer of proof, but affirms on the basis that excluding the testimony amounted to harmless error.  The majority notes the differing views on the offer of proof set forth in the prior, vacated panel opinion at 100 F.3d at 566-74, 582-85.  I now examine this harmless error contention.

## B.  THE ERROR WAS NOT HARMLESS

In determining whether the district court's rejection of the offer of proof of the defendants' expert constituted harmless error, we rely on Federal Rule of Criminal Procedure 52(a).  That rule states:

> **(a)     Harmless Error.**     Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

We consider, then, whether the court's error substantially affected the defendants' rights and whether it influenced or had more than a slight influence on the jury.  See Crane v. Kentucky, 476 U.S. 683 (1986); United States v. DeAngelo, 13 F.3d 1228 (8th Cir. 1994); United States v. Copley, 938 F.2d 107 (8th Cir. 1991).  The

_____

[16]The majority opinion discusses the trial court's rejection of Dr. Underwager's attempt to buttress his testimony by references to other research and writings.  Maj. Op. at 17-18.  The majority expresses concern that admitting "other theories and writings would result in a battle of experts that could confuse or even mislead the jury."  Id. at 18.  There is no battle of experts here.  Even the prosecution's expert agreed that children's memories may be falsified.  Rouse, 100 F.3d at 572.

crucial issue at trial in this case was whether the children testified to actual events or from implanted memory. The excluded evidence directly addressed this issue and its exclusion deprived the defendants of substantial rights.

The majority considers the evidentiary error harmless because the jury received evidence about interviewing techniques, learned of the social influences affecting the alleged victims and listened to them respond to the prosecution's leading questions. In addition, the jury heard Dr. Underwager generally describe how adults can influence children's memories and the impact of these influences on the alleged victims' credibility. Further, defense counsel relied on Dr. Underwager's testimony to argue the theory of implanted memory. Thus, the majority asserts that the jury received an "informed basis on which to make its ultimate determinations as to the victims' credibility," and that trial testimony accords with the children's "free recall." Maj. Op. at 19.

I disagree for five reasons. First, in my reading of the record, no "free recall" statements by the children exist. Instead, all early statements were subject to adult influences.

Second, the jury needed the excluded expert testimony to render a truly informed judgment about whether the children's testimony resulted from implanted memory. According to Dr. Underwager and authoritative writings discussed above, the foster home persons, the social workers, the FBI and even the district judge used or permitted potentially coercive investigative questioning and techniques. Thus, if investigators used these techniques, even with the best of motives, they potentially induced false or faulty memories and testimony. The jury, however, would

not recognize these possibly coercive influences without the assistance of the excluded expert testimony.

Third, one juror "may have believed that long delay and persistent, lengthy questioning of young children would likely produce truthful testimony." Rouse, 100 F.3d at 572, n.15. As our previous panel opinion concluded, however, "the contrary has been well established," id., and this misunderstanding exemplified "the desirability and necessity of expert opinion on the subject as offered by Dr. Underwager." Id. The juror's belief, based on an assumption contrary to the expert's scientific opinion, reflected the jury's need for assistance to understand the evidence regarding the suggestibility of children's memory.

Fourth, the majority, even if not a ground for a new trial, acknowledges that the record contains some evidence of prejudice by one or more jurors against Native Americans. See Maj. Op. at 20-21; see also Rouse, 100 F.3d at 577-78. If even slight prejudice existed in one or more jury members, evidence challenging the credibility of the children's testimony against the Native American defendants would be important to help overcome any juror's prejudice.

Finally, as a result of the exclusion of the expert's opinion, the defense counsel's argument about implanted memories of the young witnesses represented empty words unsupported by evidence. The majority refers to argument of the defense counsel:

> The questions were asked over and over and over again and, when the story came out the way the adults wanted it, then the children were rewarded . . . . [W]hen [J. R.] was testifying . . . did you notice [the prosecutor] . . . phrased most of the questions in a manner in which she would get a positive response, a "Yes" answer. . . .

[Dr. Underwager] talked about the influence that people have on children, when they interview kids. He talked about memory, the process of reconstruction, implantation of memory, play-therapy, worthless. . . . The children only felt comfortable answering "Yes" or "No". They didn't show memory of the events. The FBI Agent's diagram that he used, the drawing of the male body with the penis drawn in, what did that tell the kids that he wanted to talk about? Everything was calculated to produce some sort of compliance with these kids . . . .

Maj. Op. at 19. Because the district court erroneously excluded the expert's opinion that suggestive interrogation techniques potentially tainted the children's testimony, defense counsel's statement reflected only arguments of counsel, not evidence. With Dr. Underwager's testimony, however, counsel's argument could constitute substance over rhetoric.

## II.  CONCLUSION

For the foregoing reasons, the evidentiary error in question was not harmless; rather, its exclusion substantially harmed the defendants. The circumstances of this case raise a close question as to the validity of the verdict and, therefore, I would grant the defendants a new trial.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-37-